# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IPDEV CO., <br><br> Plaintiff, <br><br> v. <br><br> AMERANTH, INC., <br><br> Defendant. | Case No.: 14cv1303 DMS (WVG) <br><br> **ORDER DENYING AMERANTH'S MOTION FOR SUMMARY ADJUDICATION OF UNENFORCEABILITY OF '449 PATENT BASED ON INEQUITABLE CONDUCT IN PROSECUTION OF '739 PATENT AND '645 CONTINUATION APPLICATION** |
| AMERANTH, INC., <br><br> Counter Claimant, <br><br> v. <br><br> IPDEV CO., <br><br> Counter Defendant. | |

This interference action is part of the consolidated proceedings between Ameranth and a number of different businesses regarding Ameranth's United States Patent Number 8,146,077 ("the '077 Patent"). With the exception of this case, all of the cases in this consolidated proceeding were filed by Ameranth and allege infringement of the '077 Patent. The present case was filed by IPDEV Co., and alleges a claim for interference between the '077 Patent and IPDEV's United States Patent Number 8,738,449 ("the '449

Patent"). IPDEV seeks a declaration that the '449 Patent has priority of invention over the '077 Patent, and that the interfering claims of the '077 Patent are invalid.

In the present motion, Ameranth asserts IPDEV committed inequitable conduct in the prosecution of another of its patents, United States Patent Number 5,991,739 ("the '739 Patent"), and an application for another patent, the '645 Application, therefore the '449 Patent is unenforceable. IPDEV filed an opposition to the motion, and Ameranth filed a reply. For the following reasons, the Court denies the motion.

# I.

# BACKGROUND

In 1996, Bryan Cupps and Tim Glass formed a company called CyberSlice, Inc. (Notice of Lodgment in Supp. of Mot., Ex. 19 at 754.[1]) According to Mr. Cupps, "CyberSlice was formed to develop and operate a new online ordering system that would allow customers using any type of computing device to order pizza, and eventually other types of food, via the internet." (*Id.*)

In or around September 1996, Mr. Glass contacted various pizza restaurants in the Boston, New York, San Francisco and Seattle areas about participating in the CyberSlice system. (*Id.*) Interested restaurants "were provided with a 'CyberSlice Registration Packet.'" (Notice of Lodgment in Supp. of Mot., Ex. 14 at 432.) The packet contained:

> A cover letter to the restaurant, asking the restaurant to pre-register for CyberSlice, to shade in its delivery area on the enclosed map, fill out an enclosed merchant form, sign an enclosed merchant agreement, enclose a restaurant menu, provide a restaurant logo, fill out an internet special form, and return the completed documents to CyberSlice.

(*Id.*) By December 1, 1996, CyberSlice had enrolled nearly 1,000 pizza restaurants in its online ordering system. (Notice of Lodgment in Supp. of Mot., Ex. 5 at 71.)

/ / /

---

[1] The page number cited refers to the bates number on the lower right corner of the exhibit.

Although CyberSlice launched its online ordering website on December 1, 1996, Mr. Cupps, who was "principally responsible for designing and implementing the technical aspects of the CyberSlice system[,]" states "the system was not fully functional and did not work properly at that time." (Notice of Lodgment in Supp. of Mot., Ex. 19 at 754.) In fact, Mr. Cupps states "the system could not process any orders until early 1997." (*Id.*)

On November 24, 1997, Messrs. Cupps and Glass filed an application for a United States Patent, Application Number 08/976,793 ("the '793 Application"), which application issued on November 23, 1999, as the '739 Patent. The '739 Patent is titled, "Internet Online Order Method and Apparatus." (Notice of Lodgment in Supp. of Mot., Ex. 3 at 38.) The Abstract describes:

> A system and method for providing an online ordering machine that manages the distribution of home delivered products over a distributed computer system …. The distributed computer system includes a group of customers connected to client computers and at least one server computer system that executes the online ordering machine. The online ordering machine provides the customers with product information from various vendors whose delivery range is within the customer's location or with product information from vendors having take out service within a specified range from the customer's location. The vendor's and customer's location is associated with a geocode representing the latitude and longitude coordinates of the location. The search for the vendors servicing the customer's location is done using the geocodes. The online ordering machine accepts orders from the customer for a particular product from a selected vendor. The order is converted into voice instructions which are transmitted to the vendor through a telephone call. The vendor receives the telephonic order and responds to voice-prompted instructions used to confirm the order.

(*Id.*)

While the '793 Application was pending, Messrs. Cupps and Glass filed the '645 Application, which was filed as a continuation of the '793 Application. During the prosecution of the '645 Application, Messrs. Cupps and Glass disclosed to the PTO that in September 1996 they began contacting pizza restaurants about participating in the CyberSlice system. (Notice of Lodgment in Supp. of Mot., Ex. 14.) They also provided the PTO with a copy of the CyberSlice Registration Packet. (Notice of Lodgment in Supp.

of Mot., Ex. 14, Ex. 15 at 480-82.) It appears the '645 Application is still pending before the PTO.

While the '645 Application was pending, Messrs. Cupps and Glass filed another patent application as a continuation of the '793 Application. That Application issued on May 27, 2014, as the '449 Patent.

## II.

## DISCUSSION

Ameranth moves for summary adjudication that the '449 Patent is unenforceable due to inequitable conduct during the prosecution of the '739 Patent and the '645 Application. IPDEV argues Ameranth has failed to meet its burden to show inequitable conduct, and its request for summary adjudication should be denied.[2]

**A. Summary Judgment**

"Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1380 (Fed. Cir. 2005) (citing Fed. R. Civ. P. 56(c)). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). To meet this burden, the

---

[2] IPDEV also raises two additional arguments, namely, that the Court should not consider this motion because it raises inequitable conduct theories not disclosed in Ameranth's Counterclaim, and that any inequitable conduct that occurred during prosecution of the '739 Patent and the '645 Application is insufficient to find the '449 Patent unenforceable. Although the Court agrees with IPDEV that the facts underlying this motion were not set out in Ameranth's Counterclaim, IPDEV has not shown it suffered any undue prejudice in responding to this motion. Therefore, the Court will consider the present motion. As to IPDEV's second argument, the Court declines to address it here in light of the discussion below.

moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this initial burden, then the burden shifts to the opposing party to show that summary judgment is not appropriate. *Id.* at 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). *See also IPXL*, 430 F.3d at 1380 (quoting *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998)) (stating "'evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent.'") However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, it must designate specific facts showing there is a genuine issue for trial. *Id.* More than a "metaphysical doubt" is required to establish a genuine issue of material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**B.     Inequitable Conduct**

In *Therasense, Inc. v. Becton Dickinson and Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (*en banc*), the Federal Circuit reassessed the doctrine of inequitable conduct. In that case, the court laid out the origins of the doctrine, which involved cases that "dealt with particularly egregious misconduct, including perjury, the manufacture of false evidence, and the suppression of evidence." *Id.* at 1287. The court followed the evolution of the doctrine away from that narrow class of cases to cases involving "a broader scope of misconduct, including not only egregious affirmative acts of misconduct intended to deceive both the PTO and the courts, but also the mere nondisclosure of information to the PTO." *Id.* The court also noted the expansion of the remedy to "unenforceability of the entire patent rather than mere dismissal of the instant suit." *Id.*

With this evolution of the doctrine, "inequitable conduct came to require a finding of both intent to deceive and materiality[,]" the standards for which "have fluctuated over time." *Id.* At one point, the court "espoused low standards for meeting the intent

5

14cv1303 DMS (WVG)

requirement, finding it satisfied based on gross negligence, or even negligence." *Id.* at 1287-88. The court "also previously adopted a broad view of materiality, using a 'reasonable examiner' standard based on the PTO's 1977 amendment to Rule 56." *Id.* at 1288. The court explained it "embraced these reduced standards for intent and materiality to foster full disclosure to the PTO." *Id.* The court noted, however, that the focus on full disclosure "had numerous unforeseen and unintended consequences. Most prominently, inequitable conduct has become a significant litigation strategy[,]" which "expands discovery into corporate practices before patent filing and disqualifies the prosecuting attorney from the patentee's litigation team." *Id.* It also "discourages settlement and deflects attention from the merits of validity and infringement issues[,]" and "'increas[e][s] the complexity, duration and cost of patent infringement litigation that is already notorious for its complexity and high cost.'" *Id.* (quoting Br. and Appendix of Am. Bar Ass'n as Amicus Curiae at 9). In essence, the court described inequitable conduct as "the 'atomic bomb' of patent law[,]" not only for its effects on litigation, but also because a finding of inequitable conduct "regarding any single claim renders the entire patent unenforceable[,]" *id.* (citing *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988)), and "can spread from a single patent to render unenforceable other related patents and applications in the same technology family." *Id.*

In light of these "far-reaching consequences," the *Therasense* court "tighten[ed] the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." *Id.* at 1290. Under these new standards, "the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO." *Id.* (citing *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). Gross negligence and negligence no longer suffice. *Id.* Furthermore,

> to meet the clear and convincing evidence standard, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." Indeed, the evidence "must be sufficient to require a finding of deceitful intent in the light of all the circumstances." Hence, when there

are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.

*Id.* at 1290-91 (citations omitted). With respect to materiality, the court adjusted that standard to one of:

but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference. In making this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction.

*Id.* at 1291-92. In addition, the court made it clear that "[i]ntent and materiality are separate requirements." *Id.* at 1290 (citing *Hoffman-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1359 (Fed. Cir. 2003)). Thus, district courts should no longer "use a 'sliding scale where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa." *Id.*

Here, Ameranth offers two primary arguments as to why the '449 Patent should be found to be unenforceable based on inequitable conduct. First, it argues information evidencing an on-sale bar was withheld from the PTO during the prosecution of the '739 Patent and the '645 Application. Second, Ameranth asserts other material information was withheld from the PTO during the prosecution of the '739 Patent and the '645 Application.

1. Evidence of an On-Sale Bar

"'Our patent laws deny a patent to an inventor who applies for a patent more than one year after making an attempt to profit from his invention by putting it on sale.'" *Merck & Cie v. Watson Labs., Inc.*, 822 F.3d 1347, 1350 (Fed. Cir. 2016) (quoting *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008)). "Section 102(b)'s onsale bar is triggered when a claimed invention is: (1) ready for patenting; and (2) the subject of a commercial offer for sale prior to the critical date." *Id.* at 1351 (citations omitted). "An invention is 'ready for patenting' when prior to the critical date: (1) the

7

invention is reduced to practice; or (2) the invention is depicted in drawings or described in writings of sufficient nature to enable a person of ordinary skill in the art to practice the invention." *Hamilton Beach Brands, Inc. v. Sunbeam Prods.*, 726 F.3d 1370, 1375 (Fed. Cir. 2013) (quoting *Atlanta Attachment*, 516 F.3d at 1365). In determining "whether there was an invalidating commercial offer to sell the product prior to the critical date, courts "'apply[ ] traditional contract law principles.'" *Merck & Cie*, 822 F.3d at 1351 (quoting *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002)). "'Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b).'" *Id.* (quoting *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001)).

In this case, the application for the '739 Patent was filed on November 24, 1997. Therefore, the critical date for determining whether there was an on sale bar is November 24, 1996. Ameranth asserts there is evidence the invention described in the '739 Patent was ready for patenting and on sale prior to that date, and that evidence was not disclosed to the PTO. IPDEV does not dispute the evidence was not disclosed, but argues it was not material. IPDEV also asserts Ameranth has failed to come forward with clear and convincing evidence of specific intent to deceive the PTO.

The first piece of evidence Ameranth relies on is the service mark registration for CyberSlice. (*See* Mem. of P. & A. in Supp. of Mot. at 6.) The registration states the CyberSlice mark was first used in August 1995, and first used in commerce in October 1996. (Notice of Lodgment in Supp. of Mot., Ex. 4.) As IPDEV points out, however, the service mark registration and the dates contained therein do not prove the invention described in the '739 Patent was either ready for patenting or on sale prior to November 24, 1996.

The second piece of evidence Ameranth relies on is a December 1, 1996 article from bizjournals.com concerning CyberSlice. (*See* Mem. of P. & A. in Supp. of Mot. at 6.) In that article, Mr. Glass stated he had "enrolled nearly 1,000 pizza outlets" in the CyberSlice

program. (Notice of Lodgment in Supp. of Mot., Ex. 5 at 71.) IPDEV does not dispute that CyberSlice had enrolled pizza vendors in its program prior to December 1, 1996. Instead, it argues those enrollments do not show the invention was on sale or the subject of an offer to sell prior to November 24, 1996.

The Examiner of the '645 Application, however, disagreed with IPDEV. (*See* Notice of Lodgment in Supp. of Mot., Ex. 16 at 499.) During the prosecution of that Application, Mr. Glass submitted a declaration in which he confirmed the information in the bizjournal article, stating "that CyberSlice began to contact pizza restaurants during September 1996 in the Boston, New York, San Francisco, and Seattle metropolitan areas about participating in the CyberSlice offering." (*Id.*) The Examiner found "[t]hese statements indicate an offer for sale more than one year prior to the filing date." (*Id.*)

Furthermore, case law refutes IPDEV's suggestion that there was no sale or offer for sale because the enrollees did not make any payments to CyberSlice before December 1, 1996. *See Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1333 (Fed. Cir. 1998) ("It is immaterial that the record shows . . . no exchange of money until after the critical date."); *Netscape Communications Corp. v. Valueclick, Inc.*, 684 F.Supp.2d 699, 706 n.8 (E.D. Va. 2010) (noting "that even if no payment was received, the on-sale bar would still apply because a mere commercial *offer* is sufficient to invoke § 102(b).") Thus, it appears the enrollment of "nearly 1,000 pizza outlets" was evidence of an offer to sell under § 102(b).

Whether that evidence was material to patentability, however, depends on whether the invention described in the '739 Patent was also ready for patenting. Ameranth argues the evidence of offers to sell is also evidence the invention was ready for patenting. (Mem. of P. & A. in Supp. of Mot. at 7.) However, Ameranth fails to cite any authority to support that position, and it is contrary to the test for on sale bars, which sets out two distinct requirements.

Ameranth relies on other evidence to support its position the invention was ready for patenting prior to November 24, 1996, but that evidence does not satisfy the "clear and

convincing" standard. First, Ameranth cites Mr. Glass's deposition testimony, (*see id.* at 7), but that testimony does not show the invention was ready for patenting prior to November 24, 1996. Second, Ameranth relies on a development timeline for the CyberSlice system. (*Id.* at 7-8.) As IPDEV points out, however, the timeline itself does not prove the invention was ready for patenting prior to November 24, 1996. Arguably, it is a forward looking, aspirational document, not evidence that the events listed therein actually occurred according to that timetable. The same may be said for the To Do List and the Business Plan. (*Id.* at 8.) Ameranth's other evidence, which includes legal correspondence and pleadings,[3] a LinkedIn Profile of Steve Green, and a December 2, 1996 article about CyberSlice published by PR Newswire, also fails to show the invention was ready for patenting prior to November 24, 1996. (*Id.* at 9-10.)

Ameranth argues this evidence was not disclosed during the prosecution of the '739 Patent, and also argues it was not disclosed during the prosecution of the '645 Application. With respect to the prosecution of the '645 Application, Ameranth asserts the failure to disclose this information evidences an intent to deceive in light of evidence that was submitted to the PTO, particularly a July 26, 2002 Declaration from Mr. Glass, an April 30, 2003 response to an office action prepared by patent counsel, and an August 1, 2002 Information Disclosure Statement submitted by patent counsel. (*Id.* at 10-13.) However, this evidence, taken alone or together, does not require a finding of intent to deceive. This

---

[3] After the '793 Application was filed, but before the '739 Patent issued, CyberSlice, Inc. became Food.com. Food.com was the assignee of the '739 Patent when it issued. In 2001, Food.com filed a suit for infringement of the '739 Patent against QuikOrder in the United States District Court for the Northern District of California. (QuikOrder is a Defendant in these consolidated proceedings and an affiliate of IPDEV.) Food.com and QuikOrder settled their dispute in 2002, and Food.com subsequently filed for bankruptcy protection in the United States Bankruptcy Court for the Northern District of California. In the bankruptcy proceedings, IPDEV purchased the '739 Patent and the '645 Application from Food.com. The legal correspondence and pleadings Ameranth relies on relate to these two Northern District of California cases.

is especially so on the present motion for summary adjudication, where the Court must construe the evidence in the light most favorable to IPDEV and draw all reasonable inferences in its favor. When the evidence is construed in this light, Ameranth is not entitled to a finding of inequitable conduct for any failure to disclose evidence of an on sale bar during prosecution of the '739 Patent or the '645 Application.

### 2. Other Evidence

In addition to the evidence of a purported on sale bar, Ameranth asserts IPDEV failed to disclose other information to the PTO during the prosecution of the '739 Patent and the '645 Application. This information includes a QuikOrder on-line ordering system, the movie "The Net," the geocoding technology of Mapquest and the voice conversion technology of Wygant Scientific, and alleged copying of information from United States Patent Number 5,778,231 ("the '231 Patent") into the '739 Patent.

#### *a. The QuikOrder System*

Ameranth alleges QuikOrder developed an on-line food ordering system that was material prior art to the '739 Patent, that IPDEV was aware of that prior art, and that it failed to disclose that prior art to the PTO with the specific intent to deceive. IPDEV does not dispute the QuikOrder system constitutes prior art or that IPDEV was aware of that prior art, but it does dispute whether that prior art was material to patentability and whether IPDEV acted with intent to deceive in failing to disclose that prior art to the PTO.

As with the evidence of an on sale bar, Ameranth has failed to show there is an absence of a genuine issue of material fact on the issues of materiality and intent with respect to the QuikOrder system. Ameranth's arguments on materiality are conclusory, and fail to show the PTO would not have allowed the claims of the '739 Patent if it had been aware of the QuikOrder system. Furthermore, Ameranth fails to show that specific intent to deceive is the only reasonable inference to be drawn from the evidence presented. For these reasons, the QuikOrder argument does not warrant summary adjudication in Ameranth's favor.

///

### b. "The Net"

Ameranth's next argument is IPDEV failed to disclose its invention was inspired by the movie "The Net." IPDEV does not dispute that the invention was inspired by "The Net," or that it did not disclose that fact to the PTO. However, it argues there is no requirement that an inventor disclose the inspiration for his invention as part of his application for a patent. The Federal Circuit appears to agree with IPDEV, *see TALtech Ltd. v. Esquel Apparel, Inc.*, 279 Fed. Appx. 974, 977 (Fed. Cir. 2008) ("an inventor is not required to disclose the object or article that inspired his invention"), and Ameranth fails to cite any authority to the contrary. In the absence of such a requirement, this argument does not warrant summary adjudication in Ameranth's favor.

### c. MapQuest/Wygant

Next, Ameranth argues IPDEV committed inequitable conduct by failing to disclose MapQuest's geocoding technology and Wygant's voice conversion technology to the PTO. Here, again, IPDEV does not dispute that it did not disclose these specific technologies to the PTO. However, it argues the technologies were not material, and further, that there was no intent to deceive the PTO.

As with the arguments discussed above, the Court finds this argument does not warrant summary adjudication in Ameranth's favor. Ameranth has failed to show there are no genuine issues of material fact on the elements of materiality and intent to deceive, and, indeed, the evidence reflects there are such issues. (*See*, *e.g.*, Notice of Lodgment in Supp. of Opp'n to Mot., Ex. 4 at 163-65.) Absent the requisite showing, Ameranth is not entitled to summary adjudication based on the failure to disclose MapQuest's geocoding technology or Wygant's voice conversion technology.

### d. The '231 Patent

Ameranth's final argument in support of its request for summary adjudication is that IPDEV failed to disclose to the PTO that it copied certain information in the application for the '739 Patent from the '231 Patent. IPDEV disputes that there was any copying, and further argues the '231 Patent was not material and there is no evidence of intent to deceive.

Although there are some similarities in the drawings of the two Patents, and the same law firm prosecuted the two Patents, Ameranth has failed to show the PTO would not have allowed any of the claims of the '739 Patent had it been aware of the '231 Patent. Unlike in *American Calcar, Inc. v. Am. Honda Motor Co.,* No. 06cv2433 DMS (KSC), 2012 U.S. Dist. LEXIS 54059 (S.D. Cal. Apr. 17, 2012), the '231 Patent does not disclose an invention similar to that described in the '739 Patent. Also unlike in *American Calcar*, the evidence does not require a finding of deceitful intent in light of all the circumstances. Accordingly, this argument does not warrant summary adjudication in Ameranth's favor.

### III.

### CONCLUSION AND ORDER

For these reasons, the Court denies Ameranth's motion for summary adjudication of unenforceability of the '449 Patent based on inequitable conduct in the prosecution of the '739 Patent and the '645 Application.

**IT IS SO ORDERED**.

Dated: October 5, 2017

Hon. Dana M. Sabraw
United States District Judge